IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MICHAEL F. SPENCER,**

    **Plaintiff,**

**v.**                                  **CIVIL ACTION NO. 2:07cv93**
                                           (Judge Maxwell)

**DR. E. MACE, Clinical Director;**
**JANET BUNTS, Health Service Administrator,**
**WARDEN JOYCE FRANCIS, Warden**

    **Defendants.**

## REPORT AND RECOMMENDATION

**I. Procedural History**

The pro se plaintiff initiated this case on November 5, 2007, by filing a civil rights complaint against the above-named defendants. On November 30, 2007, the plaintiff was granted permission to proceed as a pauper. The plaintiff paid his initial partial filing fee on January 14, 2008.

On June 13, 2008, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Summonses were issued that same day.

On September 29, 2008, the defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment with a memorandum in support. A Roseboro Notice was issued on September 30, 2008. On November 3, 2008, the plaintiff filed a Motion in Opposition to defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment.

**II.  The Complaint**

The plaintiff, is a federal inmate who is currently incarcerated at FCI Elkton which is located in Lisbon, Ohio.  However, he was previously incarcerated at FCI Gilmer located in Glenville, West Virginia.  The plaintiff filed his complaint against the above-named defendants pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and authorized suits against federal employees in their individual capacities.  In his complaint, the plaintiff alleges that the defendants acted with deliberate indifference to his serious medical needs while he was incarcerated at FCI Gilmer.  Specifically, the plaintiff alleges that the defendants: (1) forced him to work which caused him to have a heart attack; (2) failed to provide him a special diet for his high blood pressure; (3) failed to provide him heart surgery in a timely fashion; (4) failed to provide him rehabilitation consisting of physical therapy and a breathing apparatus; and (5) placed him in the special housing unit following his surgery where around-the-clock medical care was not available. As relief, the plaintiff seeks $300,000 in compensatory damages and $300,000 in punitive damages. He also seeks rehabilitation and aftercare.

**III.  The Answer**

For their answer, the defendants have filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment.  As support therefore, the defendants assert the following:

    A.  The plaintiff failed to exhaust his administrative remedies regarding his complaint concerning untimely heart surgery;

    B.  The plaintiff's claim that he was not provided heart surgery in a timely fashion fails to state a claim;

    C.  The plaintiff has failed to state a claim for relief regarding his allegation that he was not provided a special diet;

    D.  The plaintiff's allegations that he was not provided cardiac rehabilitation is

without merit;

E. The plaintiff's complaint about being placed in the SHU fails to state a constitutional violation;

F. Respondeat Superior is inapplicable in a Bivens action; and

G. The Plaintiff cannot establish Supervisory Liability.

## IV. Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations. Walker v. True, 399 F.3d 315 (4th Cir. 2005). Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 4506 (1957).

### B. Summary Judgment

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine

issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## V. **The Medical Record**

The plaintiff's medical records indicate that he was transported from FCI Gilmer to Stonewall Jackson Memorial Hospital (SJMH") on June 22, 2005, for chest pains and EKG changes. (Doc. 40,

4

p. 1). The plaintiff did not have any prior history of heart problems. (Id). At the hospital, he was diagnosed with a myocardial infarction and, on June 22, 2005 was moved to United Health Care Center("UHCC") in Clarksburg, West Virginia, for a cardiac stent placement on the same date. After the procedure, the plaintiff was returned to FCI Gilmer. The discharge notes indicated that the plaintiff could perform activities as tolerated.(Id).

The plaintiff was evaluated by medical staff at FCI Gilmer and the chronic care clinic after his return. (Id.). In addition to the evaluation performed upon his return to FCI Gilmer, the plaintiff was evaluated and treated by medical staff on July 1, 2005; July 14, 2005; July 18, 2005; August 11, 2005; September 19, 2005; November 18, 2005; December 12, 2005; January 19 2006; and April 10, 2006.(Doc. 40, p.2). Diagnostic testing, medication, and patient education were provided to the plaintiff during these visits. Patient education included a discussion of the plaintiff's condition, the need for him to follow a healthy diet, and the need for exercise. (Id.).

At the September 19, 2005 visit, the medical staff at FCI Gilmore recommended to the plaintiff that all his prescriptions be increased, including the ones for his blood pressure. It was also recommended that Thiazide[1] be added to his prescriptions to reduce his blood pressure and risk of a heart attack.(Doc. 40, p. 2). The plaintiff refused to increase or add any medications. He was described as confrontational at January 19, 2006 visit during which he complained of a poor diet. (Id.). At the April 10, 2006, evaluation, the plaintiff indicated that he had not been taking his Statin. The medical provider again recommended that the plaintiff's blood pressure medication be increased, but the plaintiff wanted a couple weeks to aggressively manage his diet and caffeine intake before changing

---

[1] Thiazide is a class of drugs that reduce the risk of heart disease, heart attack, and stroke by reducing blood pressure. (Doc. 40, p. 2).

medications. (Id.).

The plaintiff was assigned to a work detail in the Education Department in May of 2006. (Doc. 35-3, p. 1). The plaintiff was not actually assigned any duties and performed no work at all. He was on "check-in" status where all he was required to do was report to his supervisor once each day. The plaintiff was at this assignment for less than one month. (Id.). The medical records indicate that plaintiffs' only restriction at that time was no prolonged standing and no lifting over 15 pounds. (Doc. 40, p.2 ).

On May 25, 2006, the plaintiff was transported to SJMH with chest pains. He indicated to the hospital staff that the chest pains were caused by a one hundred foot walk. On May 30, 2006 he was transported to UHCC and then to Ruby Memorial Hospital after it was determined he should have cardiac bypass surgery. The surgery was performed on June 9, 2006, and the plaintiff was discharged back to FCI Gilmer on June 13, 2006. The discharge summary indicates that he was to follow up with the cardiologist in 3 weeks and should follow a cardiac diet. (Doc. 40, p.2). The discharging report also noted that the plaintiff refused sliding scale insulin for glucose coverage despite extensive patient education on this topic. (Doc. 40, pp. 2-3).

When the plaintiff returned to FCI Gilmer, he was very demanding, verbally aggressive and refused to accept educational materials on his condition. Defendant Mace Leibson, the Clinical Dir., recommended placing him in the SHU upon his return for his safety due to his freshly cracked ribs and risk of infection, but the plaintiff refused her suggestion. Despite his refusal, the Health Services Administrator, Defendant Bunts, made the decision to place him in the SHU for his safety. (Doc. 40, p.3) The plaintiff was evaluated on June 16, 2006. He was evaluated again on June 19, 2006, but refused to permit the nurse to examine the incision on his chest from the surgery. On July 20, 2006 the

plaintiff was seen by the outside cardiologist. Examination revealed that the incision was healing well, chest x-ray was normal, EKG showed normal sinus rhythm, and the plaintiff was stable. It was recommended that he engage in activity as tolerated. (Doc. 40, p.3).

On July 21, 2006, the plaintiff was evaluated by medical staff at FCI Gilmer, told to stay active by walking, and was educated on his condition. The plaintiff was examined on August 7, 2006, and opted to have his blood pressure rechecked later rather than receive an added prescription at that time. The plaintiff was examined on October 12, 2006, and instructed to walk for exercise. The plaintiff continued to be monitored and tested for his heart condition by FCI Gilmer medical staff. (Doc. 40, p.3).

On January 22, 2007, the plaintiff complained of pain, but did not want any pain medication because it was "bad for him." On February 5, 2007, a food service staff member notified Health Services that the plaintiff was caught taking items from duty service and "abusing short line privileges." The medical note indicated that the plaintiff had been given a short line pass after his myocardial infarction and that it was continued because of his complaints and threats. It was also noted that the plaintiff was walking well and his cane did not even touch the ground as he walked. It was determined that the shortline pass was no longer necessary from a medical standpoint and there was no medical reason why food service staff could not remove them from the short line pass. (Doc. 40, p.3) Also on February 5, 2007, the plaintiff's blood pressure was checked and he requested shoe insoles. (Doc. 40, p.4). He was notified that the current evaluation was for his blood pressure, and he would need to return to request shoe insoles. He indicated that it was "okay", "just add more to the "counts." (Id.).

On February 12, 2007, the medical record indicates that the recommendation would be made for plaintiff's medication to be increased, but the record also noted the plaintiff's past noncompliance

7

problems with such a suggestion. The plaintiff continued to be evaluated, treated, and instructed to stay active and eat a healthy diet. (Doc. 40, p.4).

On September 11, 2007, the plaintiff stopped medical staff on the compound regarding his medication. At that time, the plaintiff indicated he did not want to go to Health Services because he did not want to sit on the hard benches. (Doc. 40, p. 4).

During a medical examination on November 20, 2007, the plaintiff indicated he had not been going to food services but was eating soups and noodles from the commissary. He also complained about not been sent to cardiac rehabilitation. The plaintiff was again informed that it was his responsibility to manage his diet and exercise. The medical notes indicate that the plaintiff claimed he could not walk on a treadmill because there was no available medical staff to observe him on it. The plaintiff also indicated that medical staff was responsible for his myocardial infarction because of the food that was served at FCI Gilmer. He was again advised to self-select appropriate foods. (Doc. 40, p.4).

## VI. Analysis

### A. Exhaustion of Administrative Remedies

A <u>Bivens</u> action like an action under 42 U.S.C. §1983, is subject to exhaustion of administrative remedies as required by the Prison Litigation Reform Act (PLRA). <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). Under the PLRA, a prisoner bringing an action "with respect to prison conditions" under 42 U.S.C. §1983 must first exhaust all available administrative remedies. 42 U.S.C. §1997e. Exhaustion as provided in §1997e(a) is mandatory. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). While the phrase "with respect to prison conditions" is not defined in 42 U.S.C. §1997e, the Supreme Court has determined that the "PLRA's exhaustion requirement applies to all inmate

suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516 (2002).[2] Moreover, exhaustion is even required when the relief the prisoner seeks, such as monetary damages, is not available. Booth, 532 U.S. at 741.

The United States Supreme Court has held that proper exhaustion of administrative remedies is necessary, thus precluding inmates from filing untimely or otherwise procedurally defective administrative grievances or appeals and then pursuing a lawsuit alleging the same conduct raised in the grievance. See Woodford v. Ngo, 126 S.Ct. 2378 (2006). In Woodford, the United States Supreme Court clarified that the PLRA exhaustion requirement requires proper exhaustion. Id. at 2382. The Court noted that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 2386. The Court found that requiring proper exhaustion fits with the scheme of the PLRA, which serves three main goals: (1) eliminating unwarranted federal court interference with the administration of prisons; (2) "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Id. at 2388. As the Court concluded, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." Id.

The BOP provides a four-step administrative process beginning with attempted informal

---

[2]In Porter, an inmate sued the correctional officers who had severely beaten him. The inmate alleged that the correctional officers "placed him against a wall and struck him with their hands, kneed him in the back, [and] pulled his hair." Porter, 534 U.S. at 520.

resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint with the warden (BP-9),within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the Warden's response, he may appeal to the regional director of the Federal Bureau of Prisons (BP-10) within 20 calendar days of the Warden's response. Finally, if the prisoner has received no satisfaction, he may appeal to the office of the General Counsel (BP-11) within 30 calendar days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

The records supplied by the defendants establish that the plaintiff has exhausted his administrative remedies regarding his claims that he should not have been assigned to a work detail, was not provided a proper diet, was not provided rehabilitation, and that he was placed in the SHU following his release from the hospital in June 2006. (Doc. 35-2, p. 1). However, the plaintiff did not file any administrative remedies at FCI Gilmer regarding his allegation that he did not receive heart surgery in a timely fashion. (Id.). Therefore, the plaintiff's claim that his heart surgery was delayed should be dismissed for his failure to exhaust his administrative remedies.

**B. Warden Joyce Francis**

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citations omitted). Thus, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir.

1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case.[3]

In this case, plaintiff does not allege any personal involvement on the part of the warden. Instead, it appears that plaintiff has named the defendant merely in his official capacity as the Warden at USP Hazelton. However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits... 'generally present only another way of pleading an action against an entity oh which an officer is an agent.'"). Thus, remedy under Bivens is against federal officials in their individual capacities, not the federal government. Accordingly, plaintiff cannot maintain his claim against the Warden, and she should be dismissed as a defendant.

## C. Second Hospitalization/Myocardial Infarction

As noted in the recitation of the plaintiff's medical history above, the plaintiff was transported to SJMH with chest pains on May 25, 2006. On May 30, 2006 he was transported to UHCC and then to Ruby Memorial Hospital after he was determined he should have cardiac bypass surgery. The surgery was performed on June 9, 2006, and the plaintiff was discharged back to FCI Gilmer on June 13, 2006.

---

[3]In a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 297, 401 (11th Cir. 1986).

The plaintiff alleges that this second hospitalization was the result of a "deliberate order from health services" to his unit manager that he had to go to work. The plaintiff does not allege that the actual job assignment was too difficult or that the job duties contributed to his heart condition. Rather, he complains that the walk to the job assignment, which he describes as a 200 foot walk, worsened his condition (Doc. 1, p. 7).

Pursuant to BOP policy, all inmates who are able to work are required to do so. See Program Statement 5251.05, Inmate Work and Performance.[4] Furthermore, the medical staff does not assign inmates to work details but simply note any medical restrictions that an inmate may have. (Doc. 35-4, p. 1). In this case, the only medical restrictions placed on the plaintiff was that he was not to engage in prolonged standing, and he was not to lift objects weighing more than 15 pounds. (Doc. 40, p.2).

Dr. Ellen Mace Leibson, D.O., the Clinical Director at FCI Gilmer, notes her professional opinion that walking did not cause the plaintiff's heart condition, rather his coronary artery disease was the cause of his myocardial infarction. Furthermore, as noted by Dr. Leibson, walking is beneficial for patients with heart conditions and was not detrimental to the plaintiff's health. (Doc. 40, p. 4).

Furthermore, while the plaintiff complains that having to walk to his job assignment, a distance of between 100 and 200 feet, caused his heart attack and second hospitalization, it is pertinent to note that on two occasions just prior to his second hospitalization, the plaintiff

---

[4]BOP Program Statements are available online at www.bop.gov.

voluntarily walked 480 feet from A unit, where he was housed, to make purchases in the commissary.[5] Moreover, of the 480 feet that the plaintiff traversed, approximately 100 feet was at an incline. (Doc. 35-5).

Accordingly, there is no evidence whatsoever that the plaintiff's work assignment caused his myocardial infarction and his attendant second hospitalization. Rather, the medical record would indicate the plaintiff's failure to follow medical advise, including refusal to take recommended medications and failure to follow the heart healthy diet caused his coronary artery disease and subsequent coronary infarction. Therefore, this claim should be dismissed, as well.

**D. Special Diet**

The plaintiff alleges that the defendants discontinued his low salt, low fat, diabetic meals when he returned to FCI Gilmer after bypass surgery at Ruby Memorial Hospital. (Doc. 1, pp. 10-11). The Eighth Amendment requires that inmates be allowed access to necessary medical care. Estelle v. Gamble, 429 U.S.97, 104 (1976). The amendment's mandate requires officials to provide inmates with a special diet if such an accommodation is medically necessary. See Byrd v. Wilson, 701 F.2d 592, 295 (6th Cir. 1983). However, "[i]nmates have no constitutional right to have their food selected and placed on a tray for them." Gonzales v. Story, 83 F.2d 431, 1996 WL 194741, at *2 (10th Cir. 1996) (unpublished).

Heart healthy alternative are available at all BOP institutions through the inmate's self-selection from the main menu. See BOP Program Statement, 4700.05, Food Service Manual, Ch.

---

[5]Specifically, on May 8, 2006, he walked to the commissary and purchased two cookie dough ice creams, grated chess, and other items, and on May 15, 2006, he walked to the commissary and purchased pasta and ice cream. (Doc. 35-2, pp. 5-6).

13

5, p. 2. Heart healthy alternative selections are prepared without the addition of salt or fat and are similar to regular menu item whenever possible. The heart healthy alternative are available at every meal.

The medical records clearly establish that the plaintiff received patient instruction from the staff of Gilmer Health Services on numerous occasions in 2005 and 2006. This instruction included the need to follow a heart healthy diet. Furthermore, Dr Leibson has offered her medical opinion that the "heart healthy alternatives offered at every meal were medically sufficient to meet [the plaintiff's] dietary needs. It was not medically necessary for him to be prescribed a special diet to meet his medical needs..." (Doc. 40, p. 4). Accordingly, the plaintiff's claim regarding his special diet is due to be dismissed.

**E.** Cardiac Rehabilitation

Included within the plaintiff's complaint is an allegation that the defendants failed to provide him with cardiac physical therapy. Cardiac physical therapy consists of exercise and patient instruction so as to assist inmates in making health decisions, such as eating a proper diet. (Doc. 40, p.5). As noted by Dr. Leibson, the plaintiff was continuously educated on his condition, instructed to walk for exercise, and instructed to self-select a heart healthy diet from food services. (Id.). Accordingly, there is no merit to the plaintiff's allegation regarding cardiac physical therapy.

The plaintiff also alleges that a necessary breathing apparatus was not provided to him upon his return to FCI Gilmer following cardiac bypass surgery. The apparatus to which he is referring is an "incentive spirometer," which encourages patients to inhale deeply for aeration of the lungs. It is usually used in the week or so after surgery to keep a patient from developing pneumonia from

not taking deep breaths. (Doc. 40, p. 5). The medical records indicate that the plaintiff's surgery was performed on June 9, 2006, and he was discharged back to FCI Gilmer four days later on June 13, 2006. Medical personnel at FCI Gilmer determined that he was not in need of the incentive spirometer upon his return. (Doc. 40, p. 5).

The plaintiff makes no allegation that he suffered any medical complication as the result of not having the use of the incentive sprirometer upon his return to FCI Gilmer. At best, he merely indicates a disagreement with the care he was provided. However, a disagreement between an inmate and his physician as to what medical care is appropriate does not state a claim for deliberate indifference to medical needs. See Wright v. Collins, 766 F.2d 841 (4th Cir. 1985)(finding that a disagreement between an inmate and a physician over the proper medical care did not establish a claim of deliberate indifference). Accordingly, this claim also fails.

**F. Placement in the SHU**

The plaintiff's final allegation is that he was placed in the SHU upon his return from cardiac bypass surgery where he not only did not receive 24-hour medical care but was "treated like a person under penal situation." (Doc. 1, p. 10). Despite the plaintiff's complaint that he was transferred to the SHU as opposed to be placed in an observation cell in the Health Service Department, the plaintiff again fails to state a claim upon which relief can be granted.

Dr. Leibson recommended that the plaintiff be placed in the SHU upon his discharge from the hospital for his own safety due to his cracked ribs and risk of infection. (Doc. 40, p. 3). Although the plaintiff adamantly refused this suggestion, the Health Services Administrator, Janet Bunts, chose to follow the medical supervisor's suggestion and placed the plaintiff in the SHU.

Again, the plaintiff has simply stated a difference of opinion with the type of care that he required. Furthermore, the plaintiff has no constitutional right to be placed in any particular housing unit. See Meachum v. Fano, 427 U.S. 215 (1976). "In decisions concerning housing of specific prisoners, the courts must defer to the expertise and discretion of prison officials who are much better equipped to analyze prison security needs." Garrett v. Aigelone, 940 F. Supp. 933. 942 (W.D.Va. 1996) *citing* Block v. Rutherford, 468 U.S. 576 (1984).

## G. Deliberate Indifference

To state a claim under the Eighth Amendment, the plaintiff must show that defendants acted with deliberate indifference to serious medical needs of a prisoner. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A cognizable claim under the Eighth Amendment is not raised when the allegations reflect a mere disagreement between the inmate and a physician over the inmate's proper medical care, unless exceptional circumstances are alleged. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). When dealing with claims of inadequate medical attention, the objective component is satisfied by a serious medical condition.

A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990), *cert.*

16

*denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir.1987) *cert. denied,* 486 U.S. 1006 (1988).[6]

A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth 834 F.2d at 347. Thus, while failure to provide recommended elective knee surgery does not violate the Eighth Amendment, Green v. Manning, 692 F.Supp. 283 (S.D. Ala.1987), failure to perform elective surgery on an inmate serving a life sentence would result in permanent denial of medical treatment and would render the inmate's condition irreparable, thus violating the Eighth Amendment. Derrickson v. Keve, 390 F.Supp. 905, 907 (D.Del.1975). Further, prison officials must provide reasonably prompt access to elective surgery. West v. Keve, 541 F. Supp. 534 (D. Del. 1982) (Court found that unreasonable delay occurred when surgery was recommended in October 1974 but did not occur until March 11, 1996.)

The subjective component of a "cruel and unusual punishment" claim is satisfied by showing deliberate indifference by prison officials. Wilson, 501 U.S. at 303. "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official "must both be aware of facts from

---

[6] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

17

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

Here, while the plaintiff's heart condition presents a serious medical condition, the record clearly establishes that the plaintiff received proper medical care and there was no improper delay in performing cardiac bypass surgery. Furthermore, the medical record clearly establishes that the plaintiff received adequate medical supervision at FCI Gilmer for his cardiac condition both before and after his cardiac bypass surgery. He was closely monitored, received follow-up care and education.

Finally, to the extent that the plaintiff may be alleging that his medical care at FCI Gilmer amounted to malpractice, ordinary medical malpractice based upon negligence in providing care does not state a claim under the Eighth Amendment. See Estelle, *supra* at 106. ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Furthermore, the large majority of cases alleging medical Eighth Amendment violations concern the denial of medical care to a prisoner rather than the provision of substandard care; "no care," rather than "bad care." See e.g,, Holmes v. Sheahan, 930 F.2d 1196 (7th Cir.), cert. denied, 502 U.S. 960 (1991). Here, even if the plaintiff received "bad care," he did receive care. Accordingly, nothing in the record or in the plaintiff's complaint establishes any facts sufficient to support a finding that the defendants have been deliberately indifferent to his medical needs, and accordingly, the plaintiff's complaint as it relates to his 8th Amendment claims under Bivens should be dismissed for failure to state a claim.

**VII. Recommendation**

In consideration of the foregoing, it is the undersigned's recommendation that the

defendants' motion to dismiss (Doc. 34) be **GRANTED** except as to the plaintiff's claim regarding untimely heart surgery, and the plaintiff's complaint (Doc. 1) be **DISMISSED WITH PREJUDICE** under 28 U.S.C. §§ 1915A and 1915(e) for failure to state a claim except for his claim regarding untimely heart surgery which should be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust his administrative remedies.

Any party may file within ten (10) days after being served with a copy of this Recommendation with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Court. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket sheet. The Clerk of the Court is further directed to provide a copy of this Report and Recommendation to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

DATED: November 17, 2008

  /s/ James E. Seibert  
JAMES E. SEIBERT  
UNITED STATES MAGISTRATE JUDGE